# EDITH R. CUSHER, executrix, *vs*. NOBLE H. TURNER, administrator.

Norfolk. November 13, 1985. — July 15, 1986.

Present: GRANT, KAPLAN, & SMITH, JJ.

*Practice, Civil,* Ordering verdict, Judgment notwithstanding verdict. *Negligence,* Doctor. *Medical Malpractice,* Expert opinion, Standard of care. *Evidence,* Relevancy and materiality, Declaration of deceased person, Cross-examination.

At the trial of a medical malpractice action wherein it was alleged that a licensed physician specializing in the field of gynecology had failed correctly to diagnose the cancer which was present in a patient and that, as a result, the patient's condition worsened, eventuating in her death shortly after the action was commenced, there was sufficient evidence to warrant findings that the physician had been negligent in failing to perform appropriate diagnostic tests, and that there was a causal connection between this negligence and the patient's subsequent medical condition. [497-498]

At the trial of a medical malpractice action in which the defense raised the issue of the patient's contributory negligence in failing to see the physician during the period between July and October, 1980, the judge did not err in admitting evidence that the doctor was unavailable during the period in question because she was ill, where, in admitting this evidence, the judge excluded related but prejudicial evidence that during the period in question the doctor was a patient at a mental institution and that she had committed suicide a few months later. [499-500]

At the trial of a medical malpractice action, the judge did not err in admitting in evidence, over objection, a tape recording and diary prepared by the patient prior to her death of cancer, where the judge found, as required by G. L. c. 233, § 65, that the statements were made upon personal knowledge and in good faith, and his findings were supported by the record. [500]

At the trial of a medical malpractice action during which defense counsel, in cross-examining an expert witness for the plaintiff, sought to introduce statements made by the expert in a deposition in an unrelated case, the judge did not improperly restrict the cross-examination by requiring defense counsel to ask the expert witness certain questions, such as the nature of the case in which the expert had been deposed, before allowing the statements in evidence. [500]

In a medical malpractice action during which a deposition of an expert medical witness for the plaintiff was read to the jury, the judge did not err in admitting in evidence an unsigned photocopy of the patient's supplemental answers to the defendant's interrogatories, where, during the course of the deposition, defense counsel had offered the photocopy of the patient's answers as an exhibit and where the expert witness had been questioned at the deposition about those answers. [501]

CIVIL ACTION commenced in the Superior Court Department on June 19, 1981.

The case was tried before *Mel R. Greenberg,* J.

*Peter C. Kober (Donald J. Wood* with him) for the defendant.

*Charles F. Nayor (John F. Trefethen, Jr.,* with him) for the plaintiff.

SMITH, J. This malpractice action for personal injuries and consequential damages was commenced by Carole Cusher Garland on June 19, 1981, against Noble H. Turner, the administrator of the estate of Dr. Valentina Donahue-Turner (Dr. Donahue).[1] The complaint alleged that Dr. Donahue, a licensed physician specializing in the field of gynecology, failed correctly to diagnose the cancer which was present in Mrs. Garland. The complaint further alleged that, as a result of Dr. Donahue's negligence, Mrs. Garland's "condition worsened and [her cancer] further spread in the absence of appropriate medical treatment which could have and should have been properly instituted." The defendant denied the allegations and asserted various affirmative defenses, including contributory negligence.

After she brought this action, Mrs. Garland died. Her mother, Edith Cusher, was appointed executrix of her will. A suggestion of death was filed and a motion to substitute Mrs.

---

[1] Dr. Valentina Donahue married Noble H. Turner on June 7, 1980. She died on December 7, 1980. For most of the period during which she treated Mrs. Garland, Dr. Donahue-Turner was not married and practiced medicine under the name of Dr. Donahue. That name, representing the defendant, is used in the body of the opinion.

Cusher as the party plaintiff was allowed.[2] Trial in the Superior Court then followed; a jury returned a verdict of $480,000 in favor of the plaintiff. The defendant argues numerous claims of error on appeal. We affirm the judgment.

1. *Sufficiency of the evidence.* The defendant filed motions for a directed verdict and for judgment notwithstanding the verdict. Mass.R.Civ.P. 50(b), 365 Mass. 814 (1974). The judge denied the motions. In deciding whether the judge was correct in denying the defendant's motion for judgment n.o.v., we must apply the same standard of review as would apply to review of a motion for a directed verdict, *D'Annolfo* v. *Stoneham Housing Authy.,* 375 Mass. 650, 657 (1978), "that is, Does the evidence, construed against the moving party, justify a verdict against him?" *Ibid.* Therefore, we must determine whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Raunela* v. *Hertz Corp.,* 361 Mass. 341, 343 (1972), quoting from *Kelly* v. *Railway Exp. Agency, Inc.,* 315 Mass. 301, 302 (1943).

Viewing the evidence in that light, the jury could have found the following facts. Although the plaintiff was first seen by Dr. Donahue in March, 1977, her relevant gynecological history actually began in August, 1974. At that time, the plaintiff, then twenty-seven years old, was admitted to a hospital where she underwent a laparoscopy.[3] That procedure revealed that the right ovary was enlarged to approximately twice its normal size. The enlargement was believed to be due to a luteal cyst.

The plaintiff first saw Dr. Donahue on March 14, 1977. Her chief complaint concerned breast lumps that she said had been present for the past one to two years. Dr. Donahue's records indicated that the plaintiff had suffered from amenorrhea (absence of menstruation) three months prior to

---

[2] Throughout this opinion, the word "plaintiff" refers to the deceased, Mrs. Garland.

[3] A laparoscopy is a diagnostic technique in which a scope is inserted into the abdomen for the purpose of examination of the pelvic area.

her appointment. Dr. Donahue told the plaintiff to return in one year.

Two months later, on May 13, 1977, after the plaintiff had developed a pain in her right side, she went back to see Dr. Donahue. The doctor's examination revealed a five centimeter smooth mass on the right ovary. The plaintiff was seen again by Dr. Donahue on June 10, 1977. At that time, she was still experiencing pain in her right side. Dr. Donahue noted that the mass on the right ovary had regressed to three centimeters.

The plaintiff later saw Dr. Donahue on July 22 and then again on August 11, 1977. She complained of a sharp pain in her hip and irregular menses. The next visit by the plaintiff to Dr. Donahue was on April 14, 1978. There is nothing in the record concerning this visit except (1) an entry on an examination form containing only the date and the plaintiff's name, and (2) a notation on the bill rendered to the plaintiff by the doctor which indicated that the visit was for "follow up of ovarian cyst."

The plaintiff was next examined by Dr. Donahue on September 15, 1978, when her chief complaint was of urachal pain. Physical examination revealed that her abdomen was very tender. An examination showed that her right ovary was normal but that her left ovary had a four centimeter mass. Dr. Donahue referred the plaintiff to another physician to ascertain the cause of her continuing lower abdominal pain. That doctor could find no definite cause for the pain and referred the plaintiff back to Dr. Donahue. On September 29, 1978, Dr. Donahue's examination revealed a normal pelvis. She suggested that the plaintiff return to the office in six months.

The plaintiff next saw Dr. Donahue on June 14, 1979. After that visit, the plaintiff told her mother that she still had pain in her right side but that Dr. Donahue had told her, "Don't worry. It's only a cyst." For the rest of that year, according to the plaintiff's mother, the plaintiff frequently complained of pain in her right side. Commencing in January, 1980, the plaintiff appeared to be in more pain at the time of her menses. She did not look well and had lost her appetite. During February and March, 1980, the plaintiff attempted to obtain an appoint-

ment with Dr. Donahue but was unsuccessful. Her next appointment with Dr. Donahue was on June 3, 1980. The examination on that date showed that the plaintiff had a "mildly enlarged" right ovary. She complained of diarrhea, painful urination and dysmenorrhea (cramps during menstruation). In her notes, Dr. Donahue questioned whether the plaintiff might have a benign tumor. At the conclusion of the examination, however, Dr. Donahue told the plaintiff's mother that the plaintiff only had an ovarian cyst and that they should not worry.

In July, August, and September, 1980, the plaintiff's mother attempted to obtain an appointment for the plaintiff with Dr. Donahue. The secretary told her that the doctor was sick but would be back soon and that the plaintiff should wait for her return. In September, the plaintiff's condition worsened. She was in severe pain, was nauseous, and had lost weight. On October 2, Dr. Donahue examined the plaintiff, who was still complaining of abdominal pain. Dr. Donahue found a right ovarian mass and scheduled an ultrasound test. That test, performed on October 8, 1980, disclosed "a 4 × 5 cm. solid right adnexal mass." The doctor who performed the test noted that the mass was "most likely ovarian in origin . . . [and that the] [p]ossibilities . . . include ovarian tumor." On the next day, the plaintiff returned to Dr. Donahue's office, accompanied by her mother. The plaintiff's mother told Dr. Donahue that she thought the ultrasound test showed "something." Dr. Donahue insisted that it was only a cyst and that birth control pills would take care of it.

The plaintiff's condition became worse over the course of the next several days. She was nauseous, in pain, and could not eat anything. The plaintiff's mother telephoned two doctors to make an appointment for the plaintiff. The first available appointment was for October 16, 1980, with a Dr. Robert C. Knapp. However, on October 13, 1980, the plaintiff's condition became so bad that the plaintiff's mother telephoned Dr. Donahue's office. She spoke with an answering service and was referred to Dr. Robert Hunt.

The plaintiff saw Dr. Hunt that day and told him that for the past two months she had been suffering from gas pain,

nausea, pressure on her bladder and pain when she coughed. The doctor's physical examination revealed tenderness and "fullness" on her right side. He recommended that the plaintiff be admitted to a hospital for a laparoscopy and a possible operation. Before deciding whether to enter the hospital, the plaintiff saw Dr. Knapp on October 16. He noted during his examination that the right ovarian mass felt "rather firm" and concluded that, based on the history of the prolonged presence of the mass, a laparotomy was necessary.[4]

Dr. Knapp performed the laparotomy on November 17, 1980.[5] He found an "obvious" carcinoma involving, in part, a small portion of the right ovary. Cancer was also discovered to be present in the periaortic lymph nodes. He removed the tumor, but because more invasive surgery could not be performed through the small incision made for the laparotomy, and because he wanted to inform the plaintiff of his findings, he decided to proceed no further at that time. On November 25, Dr. Knapp performed another operation on the plaintiff. As a result of that operation it was pathologically determined that the plaintiff had cancer in her left ovary as well. After she was discharged from the hospital on December 4, 1980, the plaintiff began undergoing radiation therapy which she continued until May or June, 1981. During that time she was unable to eat and felt sick. Despite further operations and the use of chemotherapy, the cancer continued to spread. The plaintiff died on February 26, 1982. The death certificate stated that the cause of death was "metastatic ovarian carcinoma" and that the interval between onset and death was "2 years."

The defendant concedes that the evidence is sufficient to show that Dr. Donahue was negligent in failing to perform further diagnostic tests.[6] The defendant argues, however, that

---

[4] A laparotomy is an operation that explores the interior of the abdomen for purposes of a proper diagnosis.

[5] The operation was delayed because the plaintiff developed a severe upper respiratory infection and a bad cough which made the use of anesthesia unwise.

[6] There was ample evidence from three of the four physicians testifying on behalf of the plaintiff that Dr. Donahue had departed from accepted

the evidence was insufficient to support the experts' opinion that there was a causal connection between Dr. Donahue's failure to order tests and the subsequent medical condition of the plaintiff. There was no error.

It is well settled that a plaintiff in a medical malpractice action must establish that the physician's negligent conduct was the proximate cause of the plaintiff's injury. *Semerjian* v. *Stetson,* 284 Mass. 510, 512 (1933). *Murphy* v. *Conway,* 360 Mass. 746, 749 (1972). *Glicklich* v. *Spievack,* 16 Mass. App. Ct. 488, 492 (1983). This causal link must generally be shown by expert testimony that the injury was more probably than not a result of the physician's lack of due care. *Berardi* v. *Menicks,* 340 Mass. 396, 402 (1960). *Glicklich* v. *Spievack, supra.* A plaintiff does not satisfy her burden if the proffered expert testimony is based upon conjecture or speculation. *Murphy* v. *Conway, supra. McCarthy* v. *Hauck,* 15 Mass. App. Ct. 603, 609-610 (1983).

Four physicians testified on the plaintiff's behalf. The sum of their testimony was that, based upon reasonable medical probability, the plaintiff's cancer would not have metastasized and she would have had a much improved chance of survival, or at least a longer life, if a timely and proper diagnosis had been made by Dr. Donahue. Dr. Knapp, the surgeon who had operated on the plaintiff, was the primary expert on causation. He faulted Dr. Donahue for not instituting investigative procedures during the period (1977 to June, 1980) in which the plaintiff was her patient. It was his opinion that the mass on the plaintiff's right ovary, discovered by Dr. Donahue on May 13, 1977, was probably neoplastic and should have been surgically removed.[7] He stated that if it had been removed "there is a reasonable probability that lymph node metastasis would not have occurred."

gynecological practice in failing to order an ultrasound test prior to October 8, 1980, and in failing to undertake, at any time, either a laparoscopy or other examination of the plaintiff's pelvic area under anesthesia.

[7] According to Dr. Knapp, neoplasms are tumors which may be either benign or malignant. All the expert witnesses agreed that benign tumors often become malignant and should be removed.

The testimony of the plaintiff's other expert witnesses concurred with Dr. Knapp's testimony. In particular, they were of opinion that, given the symptoms displayed by the plaintiff (constant pain, ovary enlargement, presence of a mass or cyst), Dr. Donahue should have ordered testing of a more invasive nature.[8] The experts stated that, if such tests had been ordered by Dr. Donahue early in the period in which the plaintiff was her patient, the cancer would have been discovered and removed, preventing its spread throughout the plaintiff's body.

The defendant contends that none of the physicians testifying on behalf of the plaintiff could say precisely when the cancer began or precisely when or how quickly it metastasized or changed. Precise evidence as to the "staging" of the cancer is not required here.[9] Each of the plaintiff's medical experts, despite his inability to state exactly when the cancer had started or metastasized, testified that in his opinion, with reasonable medical certainty, the negligence of Dr. Donahue in not ordering diagnostic tests injured the plaintiff.

Therefore, the testimony of the plaintiff's expert witnesses, "that to a reasonable medical certainty the plaintiff would not have had [metastasis of her cancer] and would have had a much improved chance of survival or longer life if [diagnosis and] treatment meeting accepted standards of care had been appropriately initiated, was sufficient to meet the plaintiff's legal burden with regard to proximate cause."[10] *Glicklich* v. *Spievack, supra* at 495.

---

[8] The experts agreed that, given the plaintiff's symptoms, an ultrasound test, laparotomy or laparoscopy should have been performed earlier. Dr. Donahue had limited her examination to pap smears and manual examination.

[9] See *Glicklich* v. *Spievach, supra* at 494 n.4 for information as to the stages of cancer.

[10] The defendant also contends that the plaintiff did not meet her burden of proving causation merely by introducing in evidence the death certificate. The first sentence of G. L. c. 46, § 19, as appearing in St. 1945, c. 570, § 1, provides that a death certificate "shall be prima facie evidence of the facts recorded, but nothing contained in the record of a death which has reference to the question of liability for causing the death shall be admissible in evidence." The death certificate stated that the "interval between onset

2. *Admissibility of evidence that Dr. Donahue was absent during July to October, 1980.* Prior to trial, the defendant filed a motion in limine which sought the exclusion of certain evidence. Among the matters which the defendant sought to exclude in the motion was "testimony and/or [*sic*] documents relating to the mental condition of [Dr. Donahue] during the period June, 1980 through December, 1980, [and] . . . relating to the circumstances of the death of [Dr. Donahue]." In support of this particular aspect of the motion in limine, the defendant argued that such evidence — which would have revealed that Dr. Donahue (1) voluntarily entered and was a patient at mental health facilities during the above period and (2) committed suicide on December 7, 1980 — was both irrelevant and prejudicial. After hearing arguments of counsel, the judge ruled that the plaintiff could introduce evidence as to Dr. Donahue's unavailability during the period in question but could not go into the underlying reasons for her absence or the circumstances of her death.

At trial, there was testimony from the plaintiff's mother that on several occasions in the period between July and September, 1980, she had telephoned Dr. Donahue's office, attempting to obtain appointments for the plaintiff because she was experiencing more pain, nausea, and weight loss. There was also testimony that Dr. Donahue was absent from her office between July 24, 1980, and October, 1980, and that patients were informed that Dr. Donahue was ill and that appointments had to be rescheduled. At no time was the jury informed of the nature of Dr. Donahue's illness or the circumstances of her death.

The evidence was relevant and not prejudicial. The defendant's answer asserted that the plaintiff was contributorily negligent. The evidence was admissible to show that the plaintiff herself was not negligent in failing to see Dr. Donahue during

and death" was "2 years." The defendant argues that that figure cannot be considered as "factual." We do not reach the defendant's contention because of our holding in the body of the opinion that the plaintiff introduced sufficient evidence other than the death certificate to sustain the burden.

the period between July and October, 1980. The plaintiff's counsel stayed well within the bounds of the judge's ruling.

3. *Admissibility of tape recording and diary.* The plaintiff offered in evidence, over the defendant's objection, a tape recording and diary prepared by Mrs. Garland prior to her death. The judge conducted a voir dire on their admissibility as declarations of a deceased person. G. L. c. 233, § 65. The judge found that, because the items related to Mrs. Garland's mental and physical health, they were made upon personal knowledge. He also found that they were made in good faith. The judge's findings are supported by the record. There was no error.

4. *Limiting cross-examination of Dr. Knapp.* During the cross-examination of Dr. Knapp, defense counsel confronted him with certain statements that he had made in a deposition in another case. He wanted to offer them as prior inconsistent statements. The plaintiff objected, and the judge ruled that the statements were admissible but that defense counsel had to ask certain questions of the witness, such as the nature of the case in which the doctor had been deposed. Defense counsel refused and dropped the line of inquiry with the witness. He now claims that the judge's decision cut off his cross-examination of the witness.

The judge's requirement that defense counsel lay a foundation before the introduction of the statements was reasonable in these circumstances. The witness was being cross-examined on a highly technical matter. The judge was obviously concerned that the jury might become confused unless they understood the relationship, if any, of the instant case with that in which the doctor had been deposed. There was no error.

5. *The admission of the plaintiff's supplementary answers to interrogatories.* Dr. Hunt's deposition was read to the jury. During the course of the deposition, defense counsel had offered and marked as an exhibit an unsigned photocopy of the plaintiff's supplemental answers to the defendant's interrogatories. Dr. Hunt was examined at the deposition about those answers.

Upon conclusion of the reading of Dr. Hunt's deposition to the jury, the plaintiff offered in evidence the unsigned photocopy of the plaintiff's supplemental answers, previously admitted as an exhibit at the deposition. It was allowed in evidence over the defendant's objection. There was no error. The answers had previously been marked as an exhibit by defense counsel at the deposition and Dr. Hunt had been questioned as to their contents. Their admission at trial would be of assistance to the jury in following the deposition testimony of Dr. Hunt read to them. Even if their admission was error, it was not prejudicial because of the judge's instructions to the jury and his deletion of possibly prejudicial material.

*Judgment affirmed.*